UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

JOHN D. KETZNER, #119069 and          )
WILLIAM D. LOVETT, # 118387,           )
                                       )
            Plaintiffs,                )        Case No. 4:06-cv-73
                                       )
v.                                     )        Honorable Robert Holmes Bell
                                       )
RAY M. WILLIAMS, et al.,               )        **REPORT AND RECOMMENDATION**
                                       )
            Defendants.                )
_____)

        This is a civil action brought *pro se* by two state prisoners pursuant to 42 U.S.C. §

1983.  Plaintiff John D. Ketzner is currently an inmate at the Gus Harrison Correctional Facility

located in Adrian, Michigan.  (docket # 6).  Plaintiff William D. Lovett is currently an inmate at the

Lakeland Correctional Facility (LCF) located in Coldwater, Michigan.  Plaintiffs' complaint is

generally based on their temporary removal from LCF's Kosher Meal Program  in early 2006, after

it was determined that each plaintiff had been in possession of non-kosher food items purchased

through the prison's store.  Plaintiffs' June 19, 2006 complaint named eleven defendants:

        (1)     LCF's Food Service Director, Ray M. Williams;

        (2)     LCF's Assistant Food Service Coordinator, Deborah Lawrence;

        (3)     Correctional Facility Administration's Special Activities Coordinator, Reverend

                Dave J. Burnett;

        (4)     Camp Branch Assistant Food Service Coordinator, Kelly Murphy;

        (5)     LCF's Warden, Carol R. Howes;

(6)     LCF's Unit B Housing Unit Manager, Ozean Moore;

(7)     LCF's Unit C Housing Unit Manager, Richard Forster;

(8)     LCF's Unit B-1 Assistant Resident Unit Supervisor, Grace Paul;

(9)     LCF's Unit C-1 Assistant Resident Unit Supervisor, Cheri Fether;

(10)    Institutional Chaplain for the Coldwater Complex, Reverend Donald A. Tompkins;
        and

(11)    Director of the Michigan Department of Corrections, Patricia Caruso.

Plaintiffs' complaint[1] consists of six counts:

I.      Violation of the First Amendment's Free Exercise and Establishment Clauses;

II.     Violation of the Fourteenth Amendment's  Equal Protection Clause;

III.    Violation of the Religious Land Use and Institutionalized Persons Act of 2000
        (RLUIPA), 42 U.S.C. § 2000cc-1(a);

IV.     Violation of 42 U.S.C. §§ 1985(3) and 1986;

V.      Violation of the Fourteenth Amendment's Due Process Clause; and

VI.     Violation of Ketzner's substantive due process rights under the Fourteenth
        Amendment's Due Process Clause and retaliation in violation of Ketzner's First
        Amendment rights.

---

[1]Although plaintiffs purport to act on behalf of other prisoners, the law is well established that as *pro se* litigants they may not act in a representative capacity and are limited to representing themselves on their own claims.  *See* 28 U.S.C. § 1654; *accord Winkleman v. Parma City Sch. Dist.*, 127 S. Ct. 1994, 2000 (2007).  The Sixth Circuit has repeatedly held that *pro se* prisoner litigants are inadequate class representatives.  *See, e.g., Ziegler v. Michigan*, 59 F. App'x 622, 624 (6th Cir. 2003); *Palasty v. Hawk*, 15 F. App'x 197, 200 (6th Cir. 2001); *Marr v. Michigan*, No. 95-1794, 1996 WL 205582, at *1 (6th Cir. Apr. 25, 1996) ("[A]n imprisoned litigant who is not represented by counsel may not represent a class of inmates because the prisoner cannot adequately represent the interests of the class.") (citing *Oxendine v. Williams*, 509 F.2d 1405, 1407 (4th Cir. 1975)).

Defendants are sued in their individual and official capacities.  Plaintiffs seek monetary damages and declaratory and injunctive relief.  (docket # 1, ¶ 1).

The matter is now before me on defendants' November 6, 2006 motion for summary judgment.  (docket # 26).  On November 7, 2006, the court entered an order advising plaintiffs of their opportunity to submit affidavits, documents and other materials in opposition to defendants' motion for summary judgment.  (docket # 29).  On December 5, 2006, plaintiffs filed their response.  (docket # 42).  Defendants' motion for summary judgment is ready for decision.[2]  I recommend that all plaintiffs' claims, with the exception of those claims specifically identified in section 4 of this report and recommendation as being exhausted, be dismissed for lack of exhaustion as required by 42 U.S.C. § 1997e(a).  I further recommend that plaintiff Ketzner's claims for declaratory and injunctive relief be dismissed as moot.  I further recommend that defendants' motion for summary judgment be granted on all other claims.

## Applicable Standards

Summary judgment is appropriate when the record reveals that there are no genuine issues as to any material fact in dispute and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c); *Kocak v. Community Health Partners of Ohio, Inc.*, 400 F.3d 466, 468 (6th Cir.), *cert. denied*, 126 S. Ct. 650 (2005); *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir.), *cert. denied*, 126 S. Ct. 338 (2005).  The standard for determining whether summary judgment is appropriate is "whether 'the evidence presents a sufficient disagreement to require

_____

[2]Plaintiffs' response requested that the court defer a decision on defendants' motion for summary judgment.  In response, the court has deferred a decision.  Plaintiffs have had more than sufficient opportunity to obtain and submit further evidence in opposition to defendants' motion.

submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *State Farm Fire & Cas. Co. v. McGowan*, 421 F.3d 433, 436 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986); *see Tucker v. Union of Needletrades Indus. & Textile Workers*, 407 F.3d 784, 787 (6th Cir. 2005). The court must consider all pleadings, depositions, affidavits, and admissions on file, and draw all justifiable inferences in favor of the party opposing the motion. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Twin City Fire Ins. Co. v. Adkins*, 400 F.3d 293, 296 (6th Cir. 2005).

When the party without the burden of proof (generally the defendant) seeks summary judgment, that party bears the initial burden of pointing out to the district court an absence of evidence to support the nonmoving party's case, but need not support its motion with affidavits or other materials "negating" the opponent's claim. *See Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 787 (6th Cir. 2000); *see also Minadeo v. ICI Paints*, 398 F.3d 751, 761 (6th Cir. 2005). Once the movant shows that "there is an absence of evidence to support the nonmoving party's case," the nonmoving party has the burden of coming forward with evidence raising a triable issue of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To sustain this burden, the nonmoving party may not rest on the mere allegations of his pleadings. FED. R. CIV. P. 56(e); *see Pack v. Damon Corp.*, 434 F.3d 810, 814 (6th Cir. 2006). The motion for summary judgment forces the nonmoving party to present evidence sufficient to create a genuine issue of fact for trial. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1990). "A mere scintilla of evidence is insufficient; 'there must be evidence on which a jury could reasonably find for the [non-movant].'" *Daniels v. Woodside*, 396 F.3d 730, 734 (6th Cir. 2005) (quoting *Anderson*, 477 U.S. at 252); *see Amini v. Oberlin College*, 440 F.3d 350, 357 (6th Cir. 2006). "A nonmoving party may not avoid a properly

supported motion for summary judgment by simply arguing that it relies solely or in part on credibility considerations.  Instead, the nonmoving party must present evidence to defeat a properly supported motion for summary judgment.  The party opposing summary judgment must be able to point to some facts which may or will entitle him to judgment, or to refute the proof of the moving party in some material portion, and the opposing party may not merely recite the incantation, 'credibility,' and have a trial on the hope that a jury may disbelieve factually uncontested proof." *Fogerty v. MGM Holdings Corp., Inc.*, 379 F.3d 348, 353 (6th Cir. 2004), *cert. denied*, 543 U.S. 1120 (2005).

## Facts

The following facts are beyond genuine issue.  In late 2005, it became apparent to prison officials at LCF that prisoners who were being provided with kosher meals at State expense had been ordering significant quantities of non-kosher food items from the prison's store.  Prisoner store purchases for the period of September 2005 through December 2005 were audited.  (docket # 42, Exs. 1, 2).  An audit is an objective factor for prison officials to consider in determining whether a prisoner's request for a special diet is based on a sincerely held religious belief or simply a prisoner's personal preference.  The purchase of non-kosher snack items from the prison's store is an  indicator that the prisoner's dietary choice is one of personal preference rather than religious obligation.  (Burnett Aff. ¶ 7).  Special diets pose significant logistical, financial, and security problems for prison officials.  Kosher meals are "two and a half times the cost of provision of regular meals."  (Burnett Aff. ¶ 6).  With Michigan's already strained budget, it is impractical to provide kosher meals for prisoners who have demonstrated by their actions that keeping kosher is not

obligatory.  (Burnett Aff. ¶¶ 7, 8).  Moreover, there is a threat to the safety, security, and good order

of the prison stemming from animosity between Jewish prisoners and other prisoners who do not

keep kosher, yet receive kosher meals.  (Burnett Aff. ¶ 9).

Michigan  Department  of  Corrections  (MDOC)  policy  directive  P.D.  05.03.150

provides for temporary removal of a prisoner from a special diet:

> A prisoner approved to eat from a religious menu shall have that approval rescinded if s/he
> eats, or has in his/her possession, any food item that violates a tenet of his/her designated
> religion.  The approval shall be rescinded only after a hearing is conducted pursuant to
> Administrative Rule 791.3310 to establish the basis for that removal.  A prisoner may
> reapply to eat from a religious menu no sooner than 60 calendar days after the approval is
> rescinded . . . .

(Policy Directive P.D. 05.03.150, ¶ WW, docket # 1, Ex. 3; docket # 27, Ex. A).  Prisoners are not

removed from a special diet program until after they receive a hearing and the factual basis for

removal is established.  (*Id.*).  MDOC Operating Procedure 05.03.150-A describes the Kosher Meal

Program, and states that prisoners may be temporarily, involuntarily removed from the Kosher Meal

Program if:

> (1)   The prisoner has changed religious affiliation to a religion which does not require a
>        Kosher diet.
> (2)   Staff has observed the prisoner eating from the main line.
> (3)   Staff has observed the prisoner eating food that is not Kosher.
> (4)   Staff has observed the prisoner possessing foods that are not Kosher.

(Operating Procedure O.P. 05.03.150-A, ¶ Q, docket # 1, Ex. 1; docket # 27, Ex. B).  "A prisoner

who has been removed from the Kosher Meal Program for any reason, including upon his/her own

request, may reapply for participation in the Kosher Meal Program no sooner than sixty (60) days

after the first removal from the Program . . . ."  (*Id.).*

A.     **Prisoner William D. Lovett**

On January 14, 2006, prisoner Lovett was an inmate at the Lakeland Correctional Facility (LCF).  LCF, the Florence Crane Correctional Facility, and Camp Branch are three state prisons located in Coldwater, Michigan.  The three prisons are sometimes collectively referred to as the Coldwater Complex.  On and before January 14, 2006, prisoner Lovett had been a participant in the LCF's Kosher Meal Program.  (Lovett Aff. ¶ 2, docket # 42, Ex.9; Tompkins Aff. ¶ 4, docket # 27, Ex. C).  Lovett was called into LCF's Control Center where he received a Notice of Intent (NOI) to conduct an administrative, fact-finding hearing.  (Lovett Aff. ¶ 5).  Assistant Resident Unit Supervisor (ARUS) Fether was the reporting staff member.  Attached to the NOI was a two-page spreadsheet providing a lengthy list of the non-kosher snack items that prisoner Lovett had purchased.  (docket # 27, Ex. F).  Prisoner Lovett waived his right to a hearing.  (Lovett Aff. ¶¶ 5, 6; docket # 27, Ex. N, Forester Aff. ¶¶ 3, 4; Ex. L, Fether Aff. ¶¶ 3,4; Ex. C, Tompkins Aff. ¶ 7).  On January 30, 2006, Tompkins issued a memorandum, with a copy to Prisoner Lovett, indicating that effective January 31, 2006, prisoner Lovett would be removed from LCF's Kosher Meal Program.  (docket # 27, Ex. F; Lovett Aff. ¶ 8).  Prisoner Lovett applied for readmission.  (Lovett Aff. ¶ 13).

On or about February 8, 2006, Lovett drafted a declaration stating that on February 6, 2006, he had informed defendant Tompkins that, "as a Reform Jew, my sincerely held religious beliefs permitted me to buy and consume non-kosher food items, if so desired, in an effort to achieve . . . variety in my diet."  (docket # 42, Ex. 9A).

1.    Grievance No. LCF-2006-02-0118-20E

On February 10, 2006, prisoner Lovett filed the first of two grievances (LCF-2006-02-0118-20E). (docket # 1, Ex. 5). This grievance concerned Lovett's removal from LCF's Kosher Meal Program. Lovett's grievance admitted that he had waived his hearing on the NOI regarding his removal from the Kosher Meal Program. Prisoner Lovett objected to the rule that by "purchasing and/or consuming non-kosher foods, be they from the prison store list, fund-raisers, or vending machines in the LCF visiting room," he could be removed from the Kosher Meal Program pursuant to policy directive P.D. 05.03.150. Prisoner Lovett's grievance stated that the policy was sanctioned by MDOC's Director Patricia Caruso, and administered by Rev. Dave J. Burnett, Special Activities Coordinator, CFA. Lovett's grievance stated, "The 'Issue' raised, herein, is that the MDOC has placed an unreasonable and impermissible burden on the exercise of my sincerely held religious beliefs where the M.D.O.C. conditions (P.D. 05.03.150) receipt of an important benefit (Kosher Program) upon conduct proscribed by a religious faith (Orthodox Tenets of Judaism), and/or denied me such a benefit, thereby placing substantial and unreasonable pressure on me, as an adherent of Reform Judaism, to modify my behavior and violate my sincerely held religious beliefs . . . ." (docket # 1, Ex. 5). Three other defendants were mentioned in Lovett's grievance: Warden Howes for directing an audit of prisoner store purchases, Food Service Director Williams for reporting the audit results, and defendant Tompkins for advising Special Activities Coordinator Burnett of the January 31, 2006 effective date of prisoner Lovett's removal from the Kosher Meal Program. (*Id.*).

On March 17, 2006, the Step I response signed by ADW Hawkins affirmed Lovett's removal from the Kosher Meal Program:

Grievant was interviewed on 3/10/06.  Grievant admits to being in non-compliance with Policy Directive 05.03.150 guidelines by being in possession of and consuming non-kosher items but contends that promulgated Policy Directive has no bearing on whether or not he qualifies for Non-Kosher diet line in the institutional setting.

Interviewer informed Grievant that Policy Directive guidelines regarding the requirements for Kosher Line participation will be observed and enforced.

(3/17/06, Step I grievance response, docket # 1, Ex. 5).  Lovett's appeal to Step II denied that he had admitted to ADW Hawkins that he had been in noncompliance with Policy Directive 05.03.150 by being in possession of and consuming non-kosher items.  (3/27/06 Step II appeal, docket # 1, Ex. 5).  According to prisoner Lovett, "This subject was not raised during the interview."  The remainder of Lovett's Step II appeal was an assertion that his rights under the First and Fourteenth Amendments had been violated by his removal from the Kosher Meal Program:

The mere existence of a Policy Directive, i.e., PD 05.03.150 - Religious Beliefs and Practices of Prisoners, or Operating Procedure, i.e., OP 05.03.150-A Kosher Meal Program, does not justify the MDOC's violations of a prisoner's sincerely held religious beliefs that are guaranteed and protected by the First and Fourteenth Amendments of the United States Constitution.

(docket # 1, Ex. 5).  On March 31, 2006, Warden Howes upheld the Step I response, finding that, "The Step I response is supported."  (docket # 42, Ex. 9B).  On April 10, 2006, Lovett filed an appeal to Step III.  (Lovett Aff. ¶ 10).  Lovett's Step III appeal stated, "Supporting the Step I response to prisoner's grievance is erroneous and violates his sincerely held religious beliefs which are protected and guaranteed by the First and Fourteenth Amendments to the United States Constitution."  (docket # 1, Ex. 5).  The Step III decision issued on June 26, 2006, affirmed the decisions at Steps I and II denying Lovett's grievance.  (docket #27, Ex. A).

2.      Grievance No. LCF-2006-03-0196-09C

On March 13, 2006, Lovett filed a second grievance (LCF-2006-03-0196-09C). (docket # 1, Ex. 5).  This grievance was against LCF's Food Service Director Ray M. Williams because Williams  was in charge of the Kosher Meal Program and because he was the supervisor of Assistant Food Service Coordinator Deborah Lawrence.  The grievance was also directed against Ms. Lawrence.   Lovett's grievance admitted that he was no longer a participant in LCF's Kosher Diet Program, but stated as follows:

> The issue incorporated herein is that the MDOC Kosher Meal Program, here at LCF, violates the Laws of the Kashrut; that the kosher meal program has never been in compliance with P.D. 05.03.150 and O.P. 05.03.150-A concerning the Laws of Kashrut; that the physical plant in the LCF Chow Hall and Kitchen areas violates the Laws of the Kashrut; that Food Service Staff, namely Ms. D. Lawrence has, on occasion, ordered prisoner kosher staff to serve food on the kosher diet that had been prepared on the "regular food line;" and that these violations have denigrated and mocked my sincerely held religious beliefs.

> When I discussed this issue with ADW Hawkins, he stated that this policy, i.e. P.D. 05.03.150, as well as O.P. 05.03.150-A, was [sic] promulgated by the legislature, sanctioned by the Director of the MDOC, Ms. Patricia Caruso, administered by Rev. Dave J. Burnett, Special Activities Coordinator, CFA, therefore, it was "the law in this town."

(docket # 1, Ex. 5).  Administrative Officer Pat Schmidt signed the Step I grievance response. Lovett's appeal to Step II stated:

> The mere existence of a Policy Directive, i.e., PD-05.03.150 - Religious Beliefs and Practices of Prisoners, nor an Operating Procedure, i.e., OP-05.03.150-A - Kosher Meal Program, does not justify the MDOC's violations of a prisoner's sincerely held religious beliefs, concerning the Laws of kashrut, that are guaranteed and protected by the First and Fourteenth Amendments to the United States Constitution.  The Step I response admits that violations occurred, while avoiding the violations of "physical plant" associated with the Laws of Kashrut.  Lastly, prisoner did not raise the issue of removal from the Kosher Meal Program in this grievance.  This issue was raised in a separate grievance.

(docket # 1, Ex. 5).  On May 15, 2006, Warden Howes issued her decision upholding the Step I response.  On May 17, 2006, plaintiff pursued an appeal to Step III:

Supporting the Step I response to prisoner's grievance is erroneous and violates his sincerely held religious beliefs, concerning the Laws of the Kashrut, which are protected and guaranteed by the First and Fourteenth Amendments to the United States Constitution. The MDOC Kosher Meal Program, i.e., OP-05.03.150-A, as provided here at LCF, does not meet the Laws of Kashrut.

(docket # 42, Ex. 9). The Step III response denying Lovett's grievance was issued on August 2, 2006. (docket # 42, Ex. 9C). Plaintiffs filed their complaint shortly thereafter. (docket # 1).

Plaintiff Lovett has not identified any specific date when he failed to receive kosher food. Lovett simply states that "on occasion" he was "served meat with dairy products." (Lovett Aff. ¶ 4). Lovett did not file a grievance relating to any specific meal.

Deborah Lawrence was assigned the position of Acting Food Service Director in late March 2005. (Lawrence Aff. ¶ 3). Upon Lawrence's arrival at LCF, some kosher cooks at LCF expressed concerns about the Kosher Meal Program. (docket # 42, Ex. 4). Lawrence worked to address these and other problems as they were brought to her attention. (Lawrence Aff. ¶ 5; *see* attached 7/21/2005 and 6/1/2006 memoranda to food service workers).

## B. Prisoner John D. Ketzner

Prisoner Ketzner was a participant in the Kosher Meal Program. (Ketzner Aff. ¶ 8; Tompkins Aff. ¶ 5). Resident Unit Manager Ozean Moore wrote the NOI regarding prisoner Ketzner's participation in the Kosher Meal Program. (Moore Aff. ¶ 3, docket # 27, Ex. O). On March 3, 2006, Resident Unit Supervisor Grace Paul conducted an administrative hearing regarding whether Ketzner should be removed from the Kosher Meal Program. The Administrative Hearing Report shows that in response to the NOI, Ketzner made the following statement:

Ketzner stated that he has been advised by an attorney.

-11-

Ketzner stated the hearing process was all wrong.  Policy directives state policy.  Operating Procedure 05.03.150 A, titled Kosher Diet Program, deals with the Kosher [D]iet Program in detail and specificity.  It lays out the procedure and the conditions which have to assist [sic] in order for a staff member to issue an NOI.  Mr. Williams apparently in a move to side step the Kosher Diet Program OP is relying on a PD which is vague, ambiguous, and doesn't say who does what and when.  Nor in any PD or OP is it suggested, mentioned, or authorized for a staff member to do a store purchase audit and to use the results as a basis for removal from the Kosher Diet Program.

Ketzner further stated that it's clearly established law that prisoners have an absolute right to freely exercise their religious beliefs and rights that are absolutely protected by Federal Law and the United States Constitution.  Anyone who participates in an illegal process to deny a prisoner to free exercise of religion loses their qualified immunity and is liable for monetary damages in the United States Federal Court.  Eating non kosher foods is not a violation of the laws of the Kashrut.

(3/3/2006 Administrative Hearing Report, docket # 1, Ex. 3; docket # 27, Ex. G).  At the conclusion

of this hearing, defendant Paul recommended that plaintiff be removed form the Program:

DISPOSITION:
Recommend Prisoner Ketzner be removed from LCF's Kosher meal program for ordering various non kosher foods.  Prisoner may reapply after 60 days, after being removed from the Kosher Meal Program.

By receipt of a copy of this hearing report prisoner is advised he may grieve this hearing decision.

REASON FOR DISPOSITION:
Per PD-05.03.150, Religious Beliefs and Practices of Prisoners, states a prisoner may not possess or eat any food which violates a tenant of their designated religion.
The attached list provides the documentation of purchased non kosher food items for the months of September, October, November and December 2005.  By ordering various non kosher foods from LCF's prison store Prisoner Ketzner violated a tenant of his religion.

(docket # 1, Ex. 3; docket # 27, Ex. G).  The spreadsheet attached to the Administrative Hearing

Report (which Ketzner elected not to attach as an exhibit to the complaint) showed by date and sales

identification number 41 specific non-kosher food items prisoner Ketzner had purchased.  (docket

# 27, Ex. G).  Prisoner Ketzner never applied for readmission.

-12-

1.      Grievance No. LCF-2006-03-0196-09C

On February 8, 2006, plaintiff Ketzner filed a two-page grievance against LCF's Food Service Director Williams and Assistant Food Service Coordinator Lawrence. (LCF-2006-02-0108-09C).  (docket # 1, Ex. 4).  Ketzner's grievance claimed that Lawrence and Williams had failed to "ensure and maintain a kosher-compliant diet program for the benefit of Jewish prisoners" since the inception of the Kosher Diet Program at LCF in March of 2004:

> The Kosher Diet Program was started at Lakeland Correctional Facility in March of 2004.  Since the program's inception, and up to the present, Food Service Director Ray Williams and Assailant Food Service Director D. Lawrence have failed to ensure and maintain a kosher-compliant diet program for the benefit of Jewish prisoners.
>
> What Jewish prisoners had assumed for nearly two years was a kosher diet, which enabled them to freely exercise their sincerely held moral, ethical, and religious beliefs and as a means to reinforce their Jewish identities while in prison was in reality [sic] a sham and a denigration to them and the expression of their Jewishness rather than an enhancement to it.
>
> Williams and Lawrence are in violation of MDOC policy directives, operating procedures, and state and federal law.  These violations are numerous, serious, and wide-ranging and they include, but are not limited to the following:
> 1.      Inadequate equipment and furnishings;
> 2.      Serving non-kosher food taken from the main line;
> 3.      Non-kosher food preparation;
> 4.      Using non-kosher implements and equipment;
> 5.      Unsecure preparation and cooking area;
> 6.      Use of kosher implements and equipment by other prisoners to prepare non-kosher foods; [and]
> 7.      Storage and sanitation methods which are non-kosher.
>
> These and other violations which have been repeatedly brought to the attention of both Williams and Lawrence by prisoners in an effort to get Williams and Lawrence to bring the Kosher Diet Program into compliance.  Despite the complaints and efforts by prisoners, these violations have never been addressed or corrected by either Williams or Lawrence, and they continue to this day.
>
> Their long-term inattention to these violations is presumptive of the systematic and deliberate indifference to the sincerely held moral, ethical, and religious belief of Grievant, a Jewish prisoner, and of other Jewish prisoners, and to the clear mandate to enforce all MDOC policy directives, operating procedures, and firmly established federal law, all of which absolutely forbid the denial of, and deliberate indifference to, the free exercise of religion.  In addition to the above actions and omissions, the implicit result has been the

-13-

establishment of an MDOC-created brand of Jewish Kosher practice to which Jews have been coerced into practicing.

Greivant assumes that neither Williams nor Lawrence can rationally believe that their actions and lack of action was and is lawful.

In an attempt to allay the persistent complaints from prisoners and make the problem disappear, Williams has begun to shift the Kosher Diet Program to Camp Branch under Assistant Food Service Director Murphy. The same violations which are occurring at Lakeland continue under Murphy's supervision at Camp Branch.

(docket # 1, Ex. 4).

On February 27, 2006, the Step I response was issued by Administrative Officer Pat Smith. Smith indicated that the items required by MDOC policy would be ordered, regardless of whether they were needed to prepare meals. (docket # 1, Ex. 4). Plaintiff appealed to Step II. On March 23, 2006, Warden Howes filed the Step II response which stated, "The Step I response is supported. Per the respondent's direction at Step I, the equipment necessary for full compliance with the policy directive was ordered. Issues regarding compliance with Kosher preparation have been addressed by supervisors when they are brought to their attention." (docket # 1, Ex. 4). Ketzner apparently appealed to Step III. (docket # 1, Ex. 4). There is no evidence of a Step III response.

On December 28, 2005, LCF's Assistant Food Service Director issued a memorandum addressed to all prisoners participating in the kosher meal line advising the prisoners that in January of 2006, their meals would be prepared at Camp Branch's Kosher Kitchen. (docket # 42, Ex. 12, attachment S-2). The Camp Branch consolidation of food preparation for both regular meal and kosher meal preparation was done as a result of an effort to make food preparation more efficient for the complex, create additional positions at Camp Branch due to the increased number of prisoners, and to utilize the larger food service area. Camp Branch was the ideal location for consolidation of the services. (Howes Aff. ¶ 8). When the decision was made to begin a kosher

-14-

kitchen at Camp Branch, a large order was placed to purchase the equipment necessary to produce a kosher kitchen. This decision was also made around the same time the decision was being made to start-up a midnight shift general food preparation for the entire Coldwater Prison Complex. The two ideas, although separate, happened to occur almost simultaneously. The main kosher menu items are prepared by outside vendors. (Murphy Aff. ¶¶ 4-5, Ex. M, docket # 27).

2.     Grievance No. LCF-2006-03-0198-20E

On March 7, 2006, plaintiff Ketzner filed Grievance No. LCF-2006-03-0198-20E which states as follows:

> Grievant was unlawfully removed from the Kosher Meal Program pursuant to P.D. 05.03.150 Religious Beliefs and Practices of Prisoners by the combined efforts of Ray Williams, Carol R. Howes, RUM O. Moore, ARUS Paul, and Rev. D. A. Tompkins.
>
> MDOC policy and procedure issued by Patricia L. Caruso and enforced by CFA Special Activities Coordinator Rev. David Burnett is unconstitutional because it dictates how a Jew must observe a tenet of Judaism, and it takes sides in the debate about what is allowed.

(docket # 1, Ex. 4). ADW Hawkins was the author of this Step I response:

> Greivant interviewed on 3/30/06. Grievant contends that MDOC Policy Directive and LCF Operating Procedure lack specificity upon which to temporarily deny grievant from participation in the Kosher Diet line. Interviewer contends that grievant[']s possession of non-kosher items as verified by Grievant's store order receipt constitutes sufficient grounds based upon guidelines of promulgated Policy Directive upon which to base temporary denial of grievant from participation in Kosher Diet line, per guidelines of Policy Directive 05.03.150, [paragraph] WW.

(docket # 1, Ex. 4). Ketzner pursued a Step II appeal in which he attempted to clarify his grievance:

> Interviewer's answer is either non-responsive or incorrect. The LCF Operating Procedure that the interviewer refers to is not at issue and was not mentioned by Grievant. There is no[] LCF Operating Procedure pertaining to the Kosher Meal Program. The operating procedure the interviewer [sic] is referring to is the MDOC Operating Procedure 05.03.150A, and gives authority to P.D. 05.03.150 Religious Beliefs and Practices of Prisoners, and that PD does not contain specific requirements necessary to remove Grievant from the Kosher meal

-15-

Program, temporarily or otherwise.  Additionally, mere possession is not a violation of the Laws of Kashrut.

(docket # 1, Ex. 4).  On May 3, 2006, Warden Howes affirmed the Step I decision.  (*Id.*).  Plaintiff Ketzner appears to have pursued a Step III appeal.  (docket # 1, Ex. 4).  There is no evidence of a Step III response.  Plaintiffs filed this lawsuit on June 19, 2006.

## Discussion

### 1.    Defendants' Motion for Summary Judgment is Ready for Decision

In two affidavits (exhibits 9 and 11 attached to plaintiffs' December 5, 2006 response brief), plaintiffs requested additional time within which to respond to defendants' motion for summary judgment.  (docket # 42).  Rule 56(f) of the Federal Rules of Civil Procedure states that, "Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just."  FED. R. CIV. P. 56(f).  The United States Court of Appeals for the Sixth Circuit reviews  lower court decisions regarding Rule 56(f) affidavits under an abuse of discretion standard.  *See Audi AG v. D'Amato*, 469 F.3d 534, 542 (6th Cir. 2006); *Plott v. General Motors Corp.*, 71 F.3d 1190, 1196-97 (6th Cir. 1995); *see also Bramlage v. Wells Fargo Home Mort. Corp.*, 144 F. App'x 489, 493 (6th Cir. 2005).

Plaintiffs' brief is devoid of any reference to Rule 56(f), much less coherent argument. Exhibits 9 and 11 are labeled as Rule 56(f) affidavits.  (*See* docket # 42, Exs. 9, 11).  Prisoner Lovett states in conclusory fashion that, "The MDOC and defendants in this case are in possession of all the facts and documentation surrounding my claims . . . ."  (Ex. 9, ¶ 15).  Lovett asks that the court

-16-

"deny defendants' motion or, alternatively, stay it's [sic] decision to permit [Lovett] further discovery so that [he] can adequately oppose defendants' motion for dismissal and/or for summary judgment." (*Id.*).  No discovery requests were pending on December 5, 2006, when plaintiffs filed their response.  Plaintiffs did not serve any discovery requests during the more than ten months that have passed since their response.

Lovett's affidavit is patently deficient.  A Rule 56(f) affidavit must advise the district court of the material facts the moving party seeks to uncover and why he had not previously discovered the information.  An affidavit that "makes only general and conclusory statements regarding the need for more discovery and does not show how an extension of time would have allowed the relevant information to be discovered" is deficient.  *Cacevic v. City of Hazel Park*, 226 F.3d 483, 489 (6th Cir. 2000); *see Cunningham v. Osram Sylvania, Inc.*, 221 F. App'x 420, 423 (6th Cir.  2007) ("Rule 56(f) presupposes that affidavits will be filed by a non-moving party seeking discovery prior to a ruling on a motion for summary judgment, as required by Rule 56(c), and we have held that such affidavits should include a description of the information needed and an affirmative demonstration of how the requested discovery will permit the non-moving party to rebut the grounds alleged for summary judgment.") (citing *Abercrombie & Fitch Stores, Inc. v. American Eagle Outfitters, Inc.*, 280 F.3d 619, 627 (6th Cir. 2002)); *Short v. Oaks Correctional Facility*, 129 F. App'x 278, 281(6th Cir. 2005) ("[A] plaintiff opposing a motion for summary judgment cannot simply argue that it needs more discovery -- instead, the plaintiff must file a Rule 56(f) affidavit or a motion that indicates to the district court what material facts it hopes to uncover by the additional discovery requested.").

Ketzner's purported Rule 56(f) affidavit fares no better.  It expresses prisoner Ketzner's belief that he submitted enough evidence to defeat defendants' motion for summary judgment, but if the court finds Ketzner's response to be inadequate, Ketzner would like an opportunity to conduct additional discovery:

1. There are facts and documents, additional to those presented in plaintiffs' Complaint and their Brief in Response, which may prove essential to plaintiffs' opposition to defendants Motion for Dismissal/Summary Judgment.

2. After filing their Complaint, agents of the MDOC separated plaintiffs by transferring plaintiff Ketzner from Lakeland Correctional Facility, thus, making legal consultation, the collection of facts, and decisions about discovery next to impossible.

3. Plaintiffs believe they have adequately opposed defendants' Motion for Dismissal/Summary Judgment in their Brief in Response.  If it appears to this Court, however, that they have not, based on the absence of essential facts not presently available to plaintiffs, they submit that those facts exist and are contained in documents yet to be revealed, but are available through discovery.

4. Plaintiffs request, if this Court deems it appropriate, an order for continuance to permit discovery to be made, or to make any such other recommendations, including denial of defendants' Motion for Dismissal/Summary Judgment based on the adequacy of essential facts heretofore presented.

(docket # 42, Ex. 11, ¶¶ 1-4).  The Federal Rules of Civil Procedure do not sanction Ketzner's approach to summary judgment practice.  In the face of defendants' well-supported motion for summary judgment, plaintiffs were "required to come forward with more than a general and conclusory statement regarding the need for discovery."  *Short*, 129 F. App'x at 282.  Ketzner's affidavit contends that his transfer to another prison made consultation with prisoner Lovett more difficult.  Ketzner's argument is a red herring.  *Pro se* litigants may not represent others.  Each plaintiff is limited to asserting his own individual claims.  *See* 28 U.S.C. § 1654.  There is not now, and there has never been, a necessity for plaintiffs to coordinate their actions.  Each prisoner is

-18-

limited to litigating his own claims.  In any event, the eleven months that have passed since defendants filed their motion for summary judgment have provided plaintiffs with more than adequate time.  I find no basis for the court to further delay a ruling on defendants' motion for summary judgment.  (docket # 26).

### 2.   Injunctive and Declaratory Relief

Plaintiff Ketzner's claims for declaratory and injunctive relief are moot as a result of his transfer to a different correctional facility.  *See Kensu v. Haigh*, 87 F.3d 172, 175 (6th Cir. 1996); *Abdur-Rahman v. Michigan Dep't of Corrections*, 65 F.3d 489, 491 (6th Cir. 1995); *see also Henderson v. Martin*, 73 F. App'x 115, 117 (6th Cir. 2003).

### 3.   Eleventh Amendment Immunity

All plaintiffs' claims for monetary damages against defendants in their official capacities are barred by Eleventh Amendment immunity.  Eleventh Amendment immunity is a threshold issue that should be raised and decided by the trial court.  *See Nair v. Oakland County Cmty. Mental Health Auth.*, 443 F.3d 469, 474 (6th Cir. 2006); *Rossborough Mfg. Co. v. Trimble*, 301 F.3d 482, 489 (6th Cir. 2002); *Johnson v. University of Cincinnati*, 215 F.3d 561, 570-71 (6th Cir. 2000).  A suit against a state officer in his official capacity is simply another way of pleading an action against the state.  *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989).  The Eleventh Amendment generally[3] bars suit in federal court against a state and its departments or

---

[3] The well-recognized exception to the general rule is an action for prospective, non-monetary relief such as an injunction against a state officer in his or her official capacity based upon a claim that the state officer's action is unconstitutional.  *See Ex Parte Young*, 209 U.S. 123 (1908); *see also Edelman v. Jordan*, 415 U.S. 651, 664 (1974); *Ernst v. Rising*, 427 F.3d 351, 358 (6th Cir. 2005)(*en banc*).

agencies unless the state has waived its sovereign immunity or unequivocally consented to be sued. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984); *Skinner v. Govorchin*, 463 F.3d 518, 524 (6th Cir. 2006). The State of Michigan has not consented to civil rights suits in federal court. *See Johnson v. Dellatifia*, 357 F.3d 539, 545 (6th Cir. 2004); *Abick v. Michigan*, 803 F.2d 874, 877 (6th Cir. 1986); *see also Hill v. Michigan*, 62 F. App'x 114, 115 (6th Cir. 2003). Furthermore, States and their departments are not "persons" within the meaning of 42 U.S.C. § 1983. *See Will v. Michigan Dep't of State Police*, 491 U.S. at 71. Defendants are entitled to judgment in their favor as a matter of law on plaintiffs' claims for monetary damages against defendants in their official capacities.

### 4.    Exhaustion of Administrative Remedies

Defendants have raised the affirmative defense of plaintiffs' failure to exhaust administrative remedies. (Def. Brief at 2, docket # 27). Pursuant to 42 U.S.C. § 1997e(a), a prisoner bringing an action with respect to prison conditions under 42 U.S.C. § 1983 must exhaust available administrative remedies. *Jones v. Bock*, 127 S. Ct. 910, 923 (2007); *see Booth v. Churner*, 532 U.S. 731 (2001). A prisoner must exhaust available administrative remedies, even if the prisoner may not be able to obtain the specific type of relief he seeks in the state administrative process. *See Booth*, 532 U.S. at 734.

In *Jones v. Bock*, the Supreme Court held that "exhaustion is an affirmative defense, and prisoners are not required to specifically plead or demonstrate exhaustion in their complaints." 127 S. Ct. at 921. Moreover, the burden is on defendants to show that plaintiffs failed to properly exhaust their administrative remedies. The Court's *Jones v. Bock* decision reiterated that "no

unexhausted claim may be considered." 127 S. Ct. at 923.  The Supreme Court held that when a prisoner complaint contains both exhausted and unexhausted claims, the lower courts should not dismiss the entire "mixed" complaint, but are required to dismiss the unexhausted claims and proceed to address only the exhausted claims.  127 S. Ct. at 923-26.

Plaintiffs' response to the affirmative defense of exhaustion is twofold.  First, plaintiffs invoke "permissive joinder" under Rule 20 of the Federal Rules of Civil Procedure.  (Plfs. Brief at 3).  Rule 20 is not a means of avoiding compliance with the statutory requirement of exhaustion of available administrative remedies.  42 U.S.C. § 1997e(a).  Second, plaintiffs attempt to construe their grievances so broadly, and the claims in their complaint in such general terms, that the former would encompass the latter as to all claims against all defendants, with the exception of defendant Forster:

> Plaintiffs have identified each defendant in one or more of their four grievances as to the central issues, as well as each defendant's particular involvement, with the exception of Resident Unit Manager Richard Forster.  Plaintiffs agree with defendants that Forster was not named in any grievance.  Plaintiffs have no objection if this Court recommends that Richard Forster be dismissed as a defendant in this case and from any liability arising out of it.

(Plfs. Brief at 4).  I recommend that all claims against Richard Forster be dismissed, because plaintiffs have conceded that all claims against defendant Forster remain unexhausted.  The argument that "plaintiffs identified each defendant in one or more of their four grievances as to the central issues" does not suffice for purposes of exhaustion of administrative remedies.  It is necessary to undertake a more focused examination of the individuals named in each grievance and the factual allegations made against that individual.  In order to properly exhaust administrative remedies, prisoners must complete the administrative review process in accordance with the deadlines and

other applicable procedural rules established by state law.  *Jones v. Bock*, 127 S. Ct. at 922-23;

*Woodford v. Ngo*, 126 S. Ct. 2378, 2386 (2006).  MDOC Policy Directive 03.02.130 (eff. 12/19/03)[4]

sets forth the applicable grievance procedures.  The policy provides instructions regarding what

information needs to be included and requires that the issues be stated briefly.  Information provided

must be limited to the facts involving the issue being grieved (i.e., who, what, when, where, why,

how).  Dates, times, places and names of all those involved in the issue being grieved must be

included.  (P.D. 03.02.130(T), docket # 42, Ex. 13).  Thus, where an individual is not named in the

Step I grievance, or is mentioned for the first time during an appeal of a denial of a grievance,[5] the

claims against that individual are not properly exhausted.  *See Walker v. Hoffbauer*, No. 2:06-cv-216,

2007 WL 2710823, at *3-4 (W.D. Mich. Sept. 13, 2007); *Edwards v. Burnett*, No. 05-cv-73790,

2007 WL 1768770, *2 (E. D. Mich. June 15, 2007).[6]

       It is undisputed that William Lovett filed two grievances (grievance numbers LCF-

2006-02-0118-20E and LCF-2006-03-196-09C).  (Plfs. Brief at 2).  Lovett's grievance against

defendants Caruso and Burnett claimed that, "MDOC has placed an unreasonable and impermissible

burden on the exercise of my sincerely held religious beliefs where the M.D.O.C. conditions (P.D.

---

[4]On July 9, 2007, the MDOC amended Policy Directive 03.02.130.  The 2003 version of Policy Directive 03.02.130 was in effect at all times relevant to this lawsuit.

[5]The prisoner must also pursue appeals of his grievance through Step III of the administrative process.  The 4 grievances at issue in this case satisfied the appeals process requirements.

[6]"The *Bock* Court dealt with Michigan Department of Corrections ("MDOC") Policy Directive 03.02.130, effective 11/01/00.  In that particular version of 03.02.130 there was no requirement that particular officials must be named in a Step I Grievance.  However, here we are dealing with MDOC Policy Directive 03.02.130, effective 12/19/03" which requires that "Dates, times, places and names of all those involved in the issue being grieved are to be included." *Edwards v. Burnett*,  2007 WL 1768770, *2.

05.03.150) receipt of an important benefit (Kosher Program) upon conduct proscribed by a religious faith (Orthodox Tenets of Judaism), and/or denied me such a benefit, thereby placing substantial and unreasonable pressure on me, as an adherent of Reform Judaism, to modify my behavior and violate my sincerely held religious beliefs."  (Grievance No. LCF-2006-02-0118-20E).  I find that Lovett properly exhausted his First Amendment Free Exercise and Establishment Clause and RLUIPA claims against defendants Caruso and Burnett arising from Lovett's removal from the Kosher Meal Program pursuant to P.D. 05.03.150.   Defendants Howes, Williams, and Tompkins are also mentioned in grievance number LCF-2006-02-0118-20E:  Warden Howes for directing an audit of prisoner store purchases, Food Service Director Williams for reporting the audit results, and defendant Tompkins for advising Special Activities Coordinator Burnett of the January 31, 2006 effective date of prisoner Lovett's removal from the kosher diet line.  I find that plaintiff Lovett has exhausted his First Amendment Free Exercise and Establishment Clause and RLUIPA claims regarding the grieved actions of defendants Howes, Williams, and Tompkins related to Lovett's removal from LCF's Kosher Meal Program.  Lovett did not exhaust any claim against defendants Lawrence, Murphy, Moore, Forster, Paul, and Fether with regard to Lovett's removal from the Kosher Meal Program, and I recommend that those claims be dismissed.

Lovett's second grievance ( LCF-2006-03-0196-09C) is against LCF's Food Service Director Williams and Assistant Food Service Coordinator Lawrence and sufficed to exhaust his First Amendment Free Exercise and RLUIPA claims against those defendants.  All other claims by Lovett regarding purported deficiencies in LCF's Kosher Meal Program remain unexhausted.  Thus, I recommend that all Lovett's claims regarding LCF's Kosher Meal Program made against

-23-

defendants Burnett, Murphy, Howes, Moore, Forster, Paul, Fether, Tompkins, and Caruso be dismissed for lack of exhaustion.

Plaintiff Ketzner filed two grievances (grievance numbers LCF 2006-03-0198-20E and LCF-2006-02-0108). (Plfs. Brief at 1-2). In grievance number LCF-2006-03-0198-20E, plaintiff Ketzner alleged that he was "unlawfully removed from the Kosher Meal Program pursuant to P.D. 05.03.150 Religious Beliefs and Practices of Prisoners, by the combined efforts of Ray Williams, Carol R. Howes, RUM O. Moore, ARUS Paul, and Rev. D. A. Tompkins." The only fact Ketzner alleged was the fact of his removal from the Kosher Meal Program and an allusion to a "combined effort." This arguably exhausted Ketzner's conspiracy, First Amendment, and RLUIPA claims against defendants Howes, Moore, Paul, and Tompkins. The grievance also complains that Policy Directive P.D. 05.03.150, as issued by defendant Caruso and administered by defendant Burnett, is "unconstitutional" because "it dictates how a Jew must observe a tenet of Judaism, and it takes sides in the debate about what is allowed." This was sufficient to exhaust Ketzner's First Amendment Establishment Clause claims against Caruso and Burnett regarding Ketzner's removal from the Kosher Meal Program. Ketzner did not exhaust any claims regarding his removal from the Program against defendants Lawrence, Murphy, Forster, and Fether, and I recommend that those claims be dismissed for lack of exhaustion.

Ketzner's grievance number LCF-2006-02-0108-09C exhausted his Free Exercise and RLUIPA claims against defendants Williams and Lawrence for failure to "ensure and maintain a kosher-compliant diet program . . . ." A passing reference to Camp Branch's Assistant Food Service Manager Murphy appears in the last paragraph of Ketzner's grievance. Indulgently, this is considered as sufficient to exhaust Ketzner's Free Exercise and RLUIPA claims against Murphy

-24-

regarding Camp Branch's food service.  Ketzner's claims regarding purported deficiencies in LCF's Kosher Meal Program against defendants Burnett, Howes, Moore, Forster, Paul, Fether, Tompkins, and Caruso are unexhausted and should be dismissed.

In summary, plaintiff Lovett exhausted his First Amendment Free Exercise and Establishment Clause and statutory RLUIPA claims against defendants Caruso and Burnett based on Lovett's removal from the Kosher Meal Program pursuant to P.D. 05.03.150, against defendant Howes for directing an audit or prisoner store purchases, against defendant Williams for reporting the audit results, and against defendant Tompkins for advising Special Activities Coordinator Burnett of the effective date of prisoner Lovett's removal from the kosher diet line.  Lovett exhausted First Amendment Free Exercise and RLUIPA claims against defendants Williams and Lawrence for purported deficiencies in LCF's Kosher Meal Program.  Plaintiff Ketzner exhausted his conspiracy, First Amendment, and RLUIPA claims against defendants Howes, Moore, Paul, and Tompkins relating to removal of Ketzner from the Kosher Meal Program.  Ketzner exhausted his Establishment Clause claim against defendant Caruso for adopting, and defendant Burnett for enforcing, P.D. 05.03.150 as it pertains to Ketzner's removal from the Kosher Meal Program.  Ketzner exhausted Free Exercise and RLUIPA claims against defendants Williams, Lawrence, and Murphy for failure to "ensure and maintain a kosher-compliant diet program."  All other claims against all other defendants should be dismissed for lack of exhaustion.

5.      **Claims for Monetary Damages Against Defendants in their Individual Capacities**

Plaintiffs seek awards of monetary damages against defendants in their individual capacities.  Defendants' motion for summary judgment requests entry of judgment in defendants' favor on qualified immunity, among other grounds.  "The purpose of the qualified immunity defense is to protect public officials from undue interference with their duties and from potentially disabling threats of liability." *Perez v. Oakland County*, 466 F. 3d 416, 426 (6th Cir. 2006); *see Vakilan v. Shaw*, 335 F.3d 509, 516 (6th Cir. 2003).   When a defendant raises the defense of qualified immunity, the plaintiff bears the burden of demonstrating that the defendant is not entitled to qualified immunity. *See Haynes v. City of Circleville*, 474 F.3d 357, 362 (6th Cir. 2007); *Baker v. City of Hamilton*, 471 F.3d 601, 605 (6th Cir. 2006); *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006).

In *Harlow v. Fitzgerald*, 457 U.S. 800 (1982), the Supreme Court held that "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Id.* at 818; *see Hudson v. Hudson*, 475 F.3d 741, 744  (6th Cir. 2007).  The question whether qualified immunity attaches to an official's actions is a purely legal issue for the court.  *See Fox v. DeSoto*, 489 F.3d 227, 235 (6th Cir. 2007); *Swiecicki v. Delgado*, 463 F.3d 489, 497 (6th Cir. 2006); *Summers v. Leis*, 368 F.3d 881, 885 (6th Cir. 2004).

The Supreme Court's decision in *Saucier v. Katz*, 533 U.S. 194, 200-01 (2001), emphasized that the defense of qualified immunity must be addressed in proper sequence.  The initial

inquiry must be whether the plaintiff has alleged and supported with evidence[7] facts showing that the defendants' conduct violated a constitutional or statutory right. *Saucier*, 533 U.S. at 201; *see Scott v. Harris*, 127 S. Ct. 1769, 1774 (2007); *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006); *see also Armstrong v. City of Melvindale*, 432 F.3d 695, 699 (6th Cir. 2006) ("Whether a constitutional violation occurred is a threshold issue: if the officers' conduct violated no constitutionally protected right, there is no need for further analysis."); *accord Caudill v. Hollan*, 431 F.3d 900, 908 n. 5 (6th Cir. 2005) ("[D]istrict courts . . . may not assume a constitutional violation or skip to qualified immunity, even when qualified immunity analysis seems conclusive.").

## A.    First Amendment

"The Religion Clauses of the First Amendment provide:  'Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof.'  The first of the two Clauses, commonly called the Establishment Clause, commands a separation of church and state.  The second, the Free Exercise Clause, requires government respect for, and noninterference with, the religious beliefs and practices of our Nation's people.  While the two Clauses express complementary values, they often exert conflicting pressures." *Cutter v. Wilkinson*,  544 U.S. 709, 719 (2005).

---

[7]A qualified immunity defense can be asserted at various stages of the litigation, including the summary judgment stage.  *See English v. Dyke*, 23 F.3d 1086, 1089 (6th Cir. 1994).  The qualified immunity inquiry at the summary judgment stage is distinguished from the Rule 12(b)(6) stage in that generalized notice pleading no longer suffices, and the broader summary judgment record provides the framework within which the actions of each individual defendant must be evaluated.  *See Riverdale Mills Corp. v. Pimpare*, 392 F.3d 55, 62 (1st Cir. 2004).  At the summary judgment stage, a plaintiff may not rely on his pleadings.  Rather, the issue is whether "the plaintiff has offered sufficient evidence to indicate that what the official did was objectively unreasonable in light of the clearly established constitutional rights." *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 905 (6th Cir. 2004).

(1)       Establishment Clause Claims

Plaintiffs Lovett and Ketzner argue that Policy Directive 05.03.150 and Operating Procedure O.P. 05.03.150-A adopted by Director Caruso and implemented by defendant Burnett violate their rights under the Establishment Clause.  In *Cutter v. Wilkinson*, the Supreme Court stated, "'This Court has long recognized that the government may ... accommodate religious practices ... without violating the Establishment Clause." 544 U.S. at 713-14  (quoting *Hobbie v. Unemployment Appeals Comm'n of Fla.*, 480 U.S. 136, 144-145 (1987).  "'[T]here is room for play in the joints between' the Free Exercise and Establishment Clauses, allowing the government to accommodate religion beyond free exercise requirements, without offense to the Establishment Clause."[8]  544 U.S. at 713 (quoting *Locke v. Davey*, 540 U.S. 712, 718 (2004)).  "[T]he Constitution guarantees that government may not coerce anyone to support or participate in religion or its exercise, or otherwise act in a way which establishes a state religion or religious faith, or tends to do so."  *Lee v. Weisman*, 505 U.S. 577, 587 (1992).

Lovett and Ketzner were never required to participate in the Kosher Meal Program. Both plaintiffs voluntarily participated in it.  Special religious-based diets pose a significant financial and administrative burden on Michigan's prisons.[9]  Policy Directive P.D. 05.03.150 ¶ WW and Operating Procedure O.P. 05.03.150-A, ¶ Q provide that if it is determined after a hearing that the

---

[8]Although applicable originally only against the federal government, the Establishment Clause has been incorporated against the states by the Fourteenth Amendment.  *See Everson v. Bd. of Educ.*, 330 U.S. 1, 8 (1947).

[9]Recently, this court noted that the Department of Corrections "must maintain some aspect of control in accommodating prisoners needs.  The Kosher menu program is costly and not available at every prison in the State.  Some prisoners may attempt to use the program to obtain a transfer to a different prison or to set up a particular prison employee as a potential defendant in a lawsuit." *Adams v. Burnett*, No. 2:06-cv-72, 2007 WL 329992, at * 5 (W.D. Mich. Jan. 31, 2007).

prisoner was in possession of non-kosher food, a temporary, involuntary removal from the Kosher

Meal Program is appropriate.  *See Treece v. Burnett*, No. 04-cv-110, 2007 WL 2815020, at * 2, 5

(W.D. Mich. Sept. 25, 2007).  A prisoner may reapply to participate in the Kosher Meal Program

sixty days after removal.  Lovett and Ketzner never reapplied to participate in the Kosher Meal

Program.

        Plaintiffs argue that the definition of kosher applied in the process removing them

from the Kosher Meal Program was too strict, and that it thereby favored an Orthodox Jewish faith

rather than their more liberal faith or faiths, which would apparently permit the plaintiffs to eat all

the snack food items listed on their respective store-purchase spreadsheets.[10]  (docket # 27, Exs. F,

G).  (Plfs. Brief at 10).  Plaintiffs have not undertaken an item-by-item analysis of the snack foods

such as Hostess Twinkies and Dolly Madison pies, nor have they attempted to explain why each

listed item was permitted under their particular religious belief structure.  Lovett argues in his

affidavit that, "It is my Jewish belief that the 'mere' purchase and possession of non-kosher food

does not violate the laws of the Kashrut."  (Lovett Aff. ¶ 7).  Ketzner echoed the argument in his

grievance.  Recently, this court rejected a virtually identical argument by a Michigan prisoner

---

[10]Plaintiffs argue that the three-part test that the Supreme Court enunciated in *Lemon v. Kurtzman*, 403 U.S. 602 (1971) should apply rather than the four-part test of *Turner v. Safley*, 482 U.S. 78 (1987).  The Supreme Court has never applied *Lemon* in the prison context.  By contrast, *Turner* was expressly designed for use in the prison context: "[W]hen a prison regulation impinges on an inmate's constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests."  482 U.S. at 89.  The *Turner* test is the applicable test.  Because it is discussed at length in the next section of this report and recommendation, there is no need to repeat it here.  Even assuming *arguendo* that the *Lemon* test applied, it would not warrant a different result because the policy directive and operating procedure have the secular purpose of saving the State's money, simplifying prison food service and reducing the threat of prison violence.  The primary effect is not to advance or inhibit religion, but is to achieve the above-mentioned goals.  The policy directive and operating procedure that provided for the temporary removal of plaintiffs from the Kosher Meal Program does not foster an excessive government entanglement with religion.  *See* 403 U.S. at 612-13.

claiming that the record of his "possession" of non-kosher food was insufficient to support removal from the Kosher Diet Program. *See Trece v. Burnett*, 2007 WL 2815020, at * 5. Moreover, Lovett's declaration, drafted after he had waived his hearing and been removed from the Kosher Diet Program, represented that Lovett's beliefs permitted him to "buy and consume non-kosher food items, if so desired," in order to achieve greater variety in his diet. (docket # 42, Ex. 9A). Ketzner's primary arguments against his removal from the Kosher Diet Program were (1) that prisoners had "absolute" rights to freely exercise their religious beliefs and (2) that the applicable policy directive and operating procedure were flawed. Ketzner stated that he believed that eating non-kosher foods was not a violation of the laws of the Kashrut. (docket # 27, Ex. G). If this is true, it is difficult to conceive how Ketzner could have been harmed in any way by his consumption of any non-kosher food.

The essence of plaintiffs' Establishment Clause claim is that the prison has established a religion by setting conditions under which it will accommodate, or refuse to accommodate, a prisoner's demand for kosher meals. In plaintiffs' view, their decision to eat non-kosher food at will is without consequence, while the defendants' decision to serve them non-kosher food violates their rights and constitutes an establishment of a state religion. Plaintiffs' argument is incoherent. Contrary to their assertions, plaintiffs do not have an absolute or unconditional right to kosher meals. As a consequence of their convictions, their First Amendment rights are not tantamount to those of free citizens and must yield to legitimate penological interests. In plain language, this means that the prison can impose reasonable conditions on a prisoner's ability to demand kosher meals. Those conditions do not constitute the establishment of a religion. I find that defendants' actions in refusing to cater to plaintiffs' dietary preferences and temporarily removing

-30-

them from the Kosher Meal Program did not violate the Establishment Clause.  Defendants Caruso,

Burnett, Howes, Williams, and Tompkins are entitled to judgment in their favor as a matter of law

on Lovett's Establishment Clause claims, and defendants Caruso, Burnett, Howes, Moore, Paul, and

Tompkins are entitled to judgment their favor as a matter of law on Ketzner's Establishment

Clause claims.

(2)    <u>Free Exercise Claims</u>

A prisoner retains only those First Amendment freedoms which are "not inconsistent

with his status as a prisoner or with legitimate penological objectives of the corrections system [ ]."

*Martin v. Kelley*, 803 F.2d 236, 240 n.7 (6th Cir. 1986) (quoting *Procunier*, 417 U.S. at 822); *see*

*Turner v. Safley*, 482 U.S. 78 (1987).  Lawful incarceration legitimately requires the retraction or

withdrawal of many rights and privileges as a necessary consequence of society's need to deter and

punish crime.[11]  *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987).  "The limitations on the

exercise of constitutional rights arise both from the fact of incarceration and from valid penological

objectives -- including deterrence of crime, rehabilitation of prisoners, and institutional security."

---

[11]Initial issues presented in addressing a Free Exercise Clause claim are whether the plaintiff's beliefs are religious in nature and whether those religious beliefs are sincerely held. *United States v. Seeger*, 380 U.S. 163, 183-84 (1965).  Only beliefs that are religious in nature are protected by the Free Exercise Clause.  *See Thomas v. Review Bd. of the Indian Employment Sec. Div.*, 450 U.S. 707, 714 (1981); *Sherbert v. Verner*, 347 U.S. 398 (1963); *see also DeHart v. Horn*, 227 F.3d 47, 51 (3d Cir. 2000)("The mere assertion of a religious belief [by a prisoner] does not automatically trigger First Amendment protections . . . only those beliefs which are both sincerely held and religious in nature are entitled to constitutional protection.").  Without doubt, prison officials are entitled to assure themselves of a prisoner's sincerity of religious belief as a prerequisite to their considering a request for an accommodation.  *See Africa v. Pennsylvania*, 662 F.2d 1025, 103 (3d Cir. 1981).  In the absence of such an inquiry, prisoners would be free to assert false religious claims that are actually attempts to gain special privileges or disrupt prison life.  *See Ochs v. Thalacker*, 90 F.3d 293, 296 (8th Cir. 1996).  Defendants have not sought summary judgment on the grounds that plaintiffs' beliefs are not religious in nature or that they are not sincerely held.

*Pell v. Procunier*, 417 U.S. 817, 822-23 (1974).  "The Supreme Court has held that in most circumstances, prison officials 'should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.'" *Flagner v. Wilkinson*, 241 F.3d 475, 481 (6th Cir. 2001) (quoting *Bell v. Wolfish*, 441 U.S. 520, 547 (1979)).

In *O'Lone v. Estate of Shabazz*, 482 U.S. 342 (1987), the Supreme Court held that the constitutionality of prison regulations that infringe upon a prisoner's rights under the First Amendment must be evaluated under the test of *Turner v. Safley*, 482 U.S. 78 (1987).  The Supreme Court noted that it is well established that lawful incarceration legitimately requires restrictions on many rights and privileges as a necessary consequence of a criminal conviction.  *O'Lone*, 482 U.S. at 348.

> [S]uch a standard is necessary 'if prison administrators . . ., and not the courts [are] to make the difficult judgments concerning institutional operations.'  *Jones v. North Carolina Prisoner's Union*, 433 U.S. [119,] 128 [(1977)].  Subjecting day-to-day judgments of prison officials to an inflexible strict scrutiny analysis would seriously hamper their ability to anticipate security problems and adopt innovative solutions to the intractable problems of prison administration.  The rule would also distort the decision making process, for every administrative judgment would be subject to the possibility that some court somewhere would conclude that it had a less restrictive way of solving the problem at hand.  Courts inevitably would become the primary arbiters of what constitutes the best solution to every administrative problem, thereby 'unnecessarily perpetuat[ing] the involvement of the federal courts in the affairs of prison administration.'  *Procunier v. Martinez*, 416 U.S. [396], 407 [(1974)].

*Turner*, 482 U.S. at 89. The familiar *Turner* factors are: (1) whether there is a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it; (2) whether there are alternative means of exercising the right that remain open to prison inmates; (3) what impact that accommodation of the asserted constitutional right will have on other guards and inmates; and (4) whether there are other readily available alternatives at a *de minimis* cost

to valid penological interests.  *Turner*, 482 U.S. at 89-91.  The *O'Lone* opinion closed with the statement, "We take this opportunity to reaffirm our refusal, even where claims are made under the First Amendment, to substitute our judgment on difficult and sensitive matters of institutional administration for the determinations of those charged with the formidable task of running a prison." 482 U.S. at 353 (internal citation omitted).

In this instance, there is a valid, rational connection between the prison regulation providing for the temporary removal of prisoners from the Kosher Meal Program when they are determined to be in possession of non-kosher food items.  *See Russell v. Wilkinson*, 79 F. App'x 175, 177 (6th Cir. 2003).  The legitimate governmental interests are budgetary and security interests. Prisons need not respond to particularized religious dietary requests to comply with the First Amendment.  *See Kahey v. Jones*, 836 F.2d 948 (5th Cir. 1988).  There is a legitimate governmental interest in running a simplified food service rather than a full-scale restaurant.  *Baranowski v. Hart*, 486 F.3d 112, 122 (5th Cir. 2007).  Consequently, a prison may refuse in certain circumstances to provide religious-based diets, even where the prisoners are sincere in their requests.  486 F.3d at 122. Prison security is not only a legitimate governmental interest, it is recognized as a compelling governmental interest.  *See Hoevenaar v. Lazaroff*, 422 F.3d 366, 368 (6th Cir. 2005); *Murphy v. Missouri Dep't of Corr.*, 372 F.3d 979, 983 (8th Cir. 2004) ("Institutional security is the most compelling governmental interest in a prison setting, and security is particularly important in dealing with group activities because of the potential for riots and the extensive damage resulting therefrom.").

The Sixth Circuit rejected a virtually identical prisoner claim in *Russell v. Wilkinson.* Prisoner Russell alleged a violation of his First Amendment rights when he was denied kosher meals

after prison officials determined that Russell had purchased non-kosher food from the inmate commissary. The Sixth Circuit held, "As the denial of kosher meals was based on Russell's obvious actions in not observing kosher food requirement outside meals, [defendant] had a legitimate penological interest in discontinuing Russell's request. That legitimate penological interest concerns the maintenance of prison discipline in the facility."[12] 79 F. App'x at 177. Plaintiffs have not disputed that they retained alternative means for practicing their Jewish faith. The impact that accommodation of the asserted constitutional right would have on guards and inmates is obvious: it makes an already dangerous environment even more dangerous and imposes an unwarranted financial burden on the State of Michigan. There are no other readily available alternatives at a *de minimis* cost to valid penological interests. Defendants' actions did not violate plaintiffs' First Amendment rights under the Free Exercise Clause. *See Russell*, 79 F. App'x at 177; *accord Peterson v. Price*, No. 5:06-cv-106, 2007 WL 2893009, at * 6 (D. Nev. Sept. 28, 2007) (removal of a federal prison inmate from a kosher meal program because the inmate had violated the terms of the program by purchasing non-kosher items from the food commissary "was reasonably related to legitimate penological interests.").

       The State of Michigan expends significant financial and administrative resources in attempting to accommodate prisoners' religious beliefs by providing them with special diets that do not offend those religious beliefs. The State's resources are finite, and prisoner demands for

---

[12]In *Russell*, the Sixth Circuit held that a prisoner does not possess any protected liberty or property interest in participation in a Kosher Meal Program, that discontinuation of the prisoner's participation in such a program was not an atypical or significant hardship in relation to the ordinary incidents of prison life, and that prison officials were entitled to summary judgment on the prisoner's procedural due process claims. 79 F. App'x at 178; *see also Treece Burnett*, No. 04-cv-110, 2007 WL 2815020, at * 7 (W.D. Mich. Sept. 25, 2007) (removal of prisoner from Kosher Meal Program "did not constitute the deprivation of a constitutionally protected liberty or property interest").

specialized diets and food preparation are not.  The State of Texas recently found the financial and administrative demands posed by prisoner requests for special religiously-based diets to be overwhelming, and it declined to provide special meals or the equipment necessary for preparing them (including kosher meals), in favor of simply providing pork-free and vegetarian alternatives to the regular food line.  The Fifth Circuit, applying the *Turner* test, upheld the Texas policy[13].  *See Baranowski v. Hart*, 486 F.3d 112, 122 (5th Cir. 2007).  The court found that there was "a logical connection between the prison policy on inmate diet and the legitimate governmental interest in running a simplified prison food service rather than a full-scale restaurant." *Id.*  Granting requests for specialized diets would be expensive, diverting resources from other penological goals.  It would "place undue costs and administrative burdens on the prison system because of the likelihood of proliferation of such requests and the concomitant need to meet multiple distinct dietary requests."[14] *Id.*  Here, defendants were never required to provide prisoners Lovett and Ketzner with food service in perfect compliance with state policy directives, operating procedures, or plaintiffs' religious beliefs.  None of the claimed deficiencies in food service warranted a contemporaneous grievance by either plaintiff in this lawsuit, and plaintiffs cannot rely on grievances filed by other prisoners.  I find that defendants Lawrence, Williams, and Murphy are entitled to judgment in their favor as a matter of law on plaintiffs' Free Exercise claims.

---

[13]The Fifth Circuit also upheld the policy against a RLUIPA challenge, finding the policy to be the least restrictive means of furthering compelling governmental interests. 486 F.3d at 124-26.

[14]*See, e.g.*, *Keesh v. Smith*, No. 9:04-cv-779, 2007 WL 2815641, at * 18 (N.D.N.Y. Sept. 25, 2007)(prisoner Keesh purported to be a member of the "Tulakeesh" faith, asserting that his religious beliefs required him to have fixed diets of certain foods on certain dates, and that his food be prepared by a "Tulakeesh adherent").

Assuming *arguendo* that plaintiffs had been able to satisfy the initial requirement under *Saucier*, they would nonetheless fall short of showing that the right each claims a defendant violated was "clearly established" such that a reasonable official in the defendant's position, at the time the act was committed, would have understood that his or her behavior violated that right. 533 U.S. at 201. The Supreme Court's decision in *Brosseau v. Haugen*, 543 U.S. 194 (2004), examined the underlying purpose of the requiring that the law be clearly established:

> Qualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, misapprehends the law governing the circumstances she confronted. . . Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct. If the law at the time did not clearly establish that the officer's conduct would violate the Constitution, the officer should not be subject to liability or, indeed, even the burdens of litigation.

543 U.S. at 198. The Supreme Court and the Sixth Circuit have emphasized that the second inquiry "'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Brosseau v. Haugen*, 543 U.S. at 198 (quoting *Saucier*, 533 U.S. at 201); *see Silberstein*, 440 F.3d at 316. "'[T]he right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant sense.'" *Lyons v. City of Xenia*, 417 F.3d 565, 572 (6th Cir. 2005) (quoting *Brosseau*, 543 U.S. at 199); s*ee Perez*, 466 F.3d at 428 ("Because most legal rights are clearly established at some level of generality, immunity would be impossible to obtain if a plaintiff were required only to cite an abstract legal principle that an official had 'clearly violated.'"). "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *see Rippy v. Hattaway*, 270 F.3d 416, 424 (6th Cir. 2001). "Thus, '[t]he relevant, dispositive inquiry . . . is whether it would be clear to a reasonable officer that his conduct was unlawful in the

situation he confronted.'" *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001) (quoting *Saucier*, 533 U.S. at 201); *see Weaver v. Shadoan*, 340 F.3d 398, 407 (6th Cir. 2003); *Risbridger v. Connelly*, 275 F.3d 565, 569 (6th Cir. 2002).  Although it is not always necessary to find a case where identical conduct had previously been determined to be unconstitutional,[15] in light of preexisting law, the unlawfulness must be apparent.  *See Wilson v. Layne*, 526 U.S. 603, 615 (1999); *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003); *Risbridger*, 273 F.3d at 569.  "Ordinarily, a Supreme Court or Sixth Circuit decision on point is necessary."  *Carver v. City of Cincinnati*, 474 F.3d 283, 287 (6th Cir. 2007); *see Jackson v. Schultz*, 429 F.3d 586, 592 (6th Cir. 2005).  The court must focus on whether, at the time the defendant acted, the right asserted was "clearly established" by the decisions of the Supreme Court or the Sixth Circuit.  *See Reynolds v. City of Anchorage*, 379 F.3d 358, 366 (6th Cir. 2004); *Gragg v. Kentucky Cabinet for Workforce Dev.*, 289 F.3d 958, 964 (6th Cir. 2002).  "'[Q]ualified immunity protects all but the plainly incompetent or those who knowingly violate the law.'"  *Armstrong*, 432 F.3d at 699 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).  "Thus, officials are 'entitled to qualified immunity [when] their decision was reasonable, even if mistaken.'"  *Toms v. Taft*, 338 F.3d 519, 524 (6th Cir. 2003) (quoting *Hunter v. Bryant*, 502 U.S. 224, 229 (1991)); *Humphrey v. Mabry*, 482 F.3d 840, 847 (6th Cir. 2007) ("Qualified immunity leaves government authorities 'ample room for mistaken judgments."') (quoting *Scott v. Clay County*, 205 F.3d 867, 873 n. 9 (6th Cir. 2000)).  "If reasonable officials could disagree on the issue, immunity should be recognized."  *Key v. Grayson*, 179 F.3d 996, 1000 (6th Cir. 1999); *see Akers*, 352 F.3d at 1042.  "For qualified immunity to be surrendered, pre-existing law must dictate, that is truly compel

---

[15]"Of course, in an obvious case, [general constitutional] standards can 'clearly establish' the answer, even without a body of relevant case law."  *Brosseau*, 543 U.S. at 199; *Lyons*, 417 F.3d at 572.

(not just suggest or allow to raise a question about), the conclusion for every like-situated, reasonable government agent that what the defendant is doing violates federal law in the circumstances." *Saylor v. Board of Educ.*, 118 F.3d 507, 514 (6th Cir. 1997); *see Gragg*, 289 F.3d at 964. "The burden of convincing a court that the law was clearly established 'rests squarely with the plaintiff.'" *Key*, 179 F.3d at 1000 (quoting *Cope v. Heltsley*, 128 F.3d 452, 459 (6th Cir. 1997)); *see Perez*, 466 F.3d at 427.

Plaintiffs made no attempt to carry their burden under the second prong of the qualified immunity analysis. The Sixth Circuit's decision in *Russell v. Wilkinson* clearly established that plaintiffs could be temporarily removed from the Kosher Meal Program without violating plaintiffs' First Amendment rights. I find that defendants are entitled to qualified immunity on all plaintiffs' First Amendment claims.

### B.   Ketzner's Conspiracy Claims

Plaintiff Ketzner asserted that his removal from the kosher diet line was the product of a conspiracy. Under 42 U.S.C. § 1985(3), "conspiracy must be pled with some degree of specificity and . . . vague and conclusory allegations unsupported by material facts will not be sufficient to state a claim." *Center for Bio-Ethical Reform, Inc. v. City of Springboro*, 477 F.3d 807, 832 (6th Cir. 2007); *Fox v. Michigan State Police Dep't*, 173 F. App'x 372, 376 (6th Cir. 2006). The elements of a section 1985(3) claim are well established. *Center for Bio-Ethical Reform*, 477 F.3d at 832; *Peters v. Fair*, 427 F.3d 1035, 1038 (6th Cir. 2005). Ketzner has not presented evidence on which a reasonable trier of fact could find a violation of section 1985(3). Defendants are entitled to judgment in their favor on Ketzner's dependent claim under 42 U.S.C. § 1986. *See Radvansky v. City of Olmstead Falls*, 395 F.3d 291, 314-15 (6th Cir. 2005). Defendants would likewise be

entitled to qualified immunity under the second prong of the immunity analysis.  Ketzner has not

shown that any action of the purported conspirators, Williams, Howes, Moore, Paul, and Tompkins,

violated clearly established law.

C.      RLUIPA Claims

The Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA) states:

No government shall impose a substantial burden on the religious exercise of a person
residing in or confined to an institution, as defined in section 1997 of this title, even if the
burden results from a rule of general applicability, unless the government demonstrates that
imposition of the burden on that person--
(1) is in furtherance of a compelling governmental interest; and
(2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C.A. § 2000cc-1(a).   "The threshold inquiry under RLUIPA is whether the challenged

governmental action substantially burdens the exercise of religion.  The burden of proving the

existence of a substantial burden rests on the religious adherent." *Baranowski v. Hart*, 486 F.3d at

124; *see Dunlap v. Losey*, 40 F. App'x 41, 43 (6th Cir. 2002) ("RLUIPA . . . requires the

complainant to show that his religious exercise was substantially burdened.").   RLUIPA does not

define the phrase "substantial burden," but courts have interpreted it as being a high burden.  *See,

e.g., Watkins v. Shabazz*, 180 F. App'x 773, 775 (9th Cir. 2006) ("substantial burden on religious

exercise must be oppressive to a significantly great extent and must impose a great restriction or onus

upon such exercise.").  "[A] 'burden' on religious exercise is 'substantial' only where such imposes

'a significantly great restriction or onus upon such exercise' which 'directly coerces the religious

adherent to conform his or her behavior accordingly.'" *Treece v. Burnett*, 2007 WL 2815020, at *

4 (quoting *Warsoldier v. Woodford*, 418 F.3d 989, 995 (9th Cir.2005), and citing *Konikov v. Orange

County, Florida*, 410 F.3d 1317, 1323 (11th Cir.2005)).

To come within the scope of RLUIPA the burden in question must render religious exercise "effectively impracticable." *Marshall v. Frank*, No. 07-C-173-C, 2007 WL 1556872 at *5 (W.D. Wis. May 24, 2007) (quoting *Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752, 761 (7th Cir.2003)); *see also, Cutter v. Wilkinson*, 544 U.S. 709, 720, 125 S. CT. 2113, 161 L .Ed.2d 1020 (2005) (recognizing that RLUIPA's institutionalized persons provision was intended to alleviate only "exceptional" burdens on religious exercise). Moreover, a burden is less than "substantial" where it imposes merely an "inconvenience on religious exercise." *See, e.g., Konikov*, 410 F.3d at 1323. These conclusions recognize that RLUIPA was not intended to create a cause of action in response to every decision which serves to inhibit or constrain religious exercise, as such would render meaningless the word "substantial." *See Civil Liberties for Urban Believers*, 342 F.3d at 761.

*Treece v. Burnett*, 2007 WL 2815020, *4 (W.D. Mich. Sept. 8, 2007).

The temporary removal of Lovett and Ketzner from LCF's Kosher Meal Program did not violate their statutory rights under RLUIPA. Neither plaintiff has demonstrated that his exercise of his faith has been substantially burdened. The United States District Court for the Eastern District of Michigan recently rejected similar claims:

In the present case, plaintiffs claim that their temporary disqualification from the Kosher Meal Program burdens their exercise of Judaism because they are prevented from eating kosher food. For present purposes, the court assumes plaintiffs sincerely believe that the consumption of such food is required by their religion. However, plaintiffs have not demonstrated that their suspension from the program substantially burdens this religious exercise. The court is unaware of any case authority standing for the proposition that a temporary suspension of an inmate's participation in a meal program that caters to his religious needs constitutes a substantial burden. Rather, cases in which a substantial burden have been found involved a *permanent* prohibition.

*Berryman v. Granholm*, No. 06-cv-11010-DT, 2007 WL 2259334, at * 3 (E.D. Mich. Aug. 3, 2007); *see Perkins v. Prisk*, No. 2:07-cv-288, 2007 WL 1796238, at * 2 (W.D. Mich. June 20, 2007) (prisoner failed to carry his burned that his removal from a kosher diet in 2005 was a substantial burden on the exercise of his religious beliefs).

Furthermore, even if plaintiffs had demonstrated a "substantial burden" on their religious exercise, defendants have shown that the actions taken were the least restrictive means of

furthering compelling governmental interests.  The Supreme Court's *Cutter v. Wilkinson* decision

provided guidance to lower courts regarding the application of RLUIPA's statutory standards:

> We do not read RLUIPA to elevate accommodation of religious observances over an institution's need to maintain order and safety.  Our decisions indicate that an accommodation must be measured so that it does not override other significant interests.  In *[Estate of Thornton v.] Caldor, [Inc.*, 472 U.S. 703 (1985)], the Court struck down a Connecticut law that "arm[ed] Sabbath observers with an absolute and unqualified right not to work on whatever day they designate[d] as their Sabbath." 472 U.S., at 709, 105 S. CT. 2914.  We held the law invalid under the Establishment Clause because it "unyielding[ly] weigh[ted]" the interests of Sabbatarians "over all other interests." *Id.*, at 710, 105 S. CT. 2914.
>
> We have no cause to believe that RLUIPA would not be applied in an appropriately balanced way, with particular sensitivity to security concerns. While the Act adopts a "compelling governmental interest" standard, *see supra*, at 2118, "[c]ontext matters" in the application of that standard.  *See Grutter v. Bollinger*, 539 U.S. 306, 327, 123 S. CT. 2325, 156 L.Ed.2d 304 (2003).  Lawmakers supporting RLUIPA were mindful of the urgency of discipline, order, safety, and security in penal institutions. *See, e.g.*, 139 Cong. Rec. 26190 (1993) (remarks of Sen. Hatch).  They anticipated that courts would apply the Act's standard with "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources."

544 U.S. at 722-23.  "[P]rison security is a compelling state interest, and that deference is due to

institutional officials' expertise in this area." 544 U.S. at 725 n.13; *see Hoevenaar v. Lazaroff*, 422

F.3d 366, 370 (6th Cir. 2005) ("In conducting an analysis of whether the regulation in issue was the

least restrictive means of furthering the government's compelling security interest, the district court

did just what the Supreme Court and Congress have warned against: substituting its judgment in

place of the experience and expertise of prison officials.").[16]   The Eastern District's *Berryman* decision is instructive:

> Even if the temporary suspension from the Kosher Meal Program did constitute a substantial burden, defendants have shown that their decision furthered compelling governmental interests in the least restrictive way. Defendant Burnett avers that this meal program costs two to three times as much to operate as the regular prison meal program. Burnett Affidavit ¶ 30.  The MDOC therefore has a compelling financial interest in ensuring that kosher food is served only to those inmates who sincerely need it for religious reasons.  Defendants could reasonably doubt the sincerity of an inmate who orders non-kosher food from the prison store. The policy at issue imposes the least restrictive burden on inmates caught purchasing non-kosher food from the prison store because such inmates are not banned permanently from participation in the program, but only for a period of time (60 days for the first violation, one year for subsequent violations) and with the opportunity thereafter to reapply. This financial reason for limiting access to the Kosher Meal Program is among those specifically recognized by the Supreme Court as "compelling." And the policy abides by the "least restrictive" requirements by removing violators only temporarily and permitting them to reapply.

*Berryman v. Granholm*, 2007 WL 2259334, *3.  This court has also concluded that "temporarily removing from the kosher meal program those prisoners found to have possessed non-kosher food items constitutes the least restrictive means of furthering [the] compelling state interests" of controlling the costs of providing kosher diets to inmates and preventing religiously motivated prison violence."   *Treece v. Burnett*, 2007 WL 2815020, at * 6; *accord Andreola v. Wisconsin* 211 F. App'x 495, 499 (7th Cir. 2006) (district court correctly determined that under RLUIPA defendants were not required to spend an additional $2000 to provide prisoner with pre-packaged kosher meals and "defendants ha[d] a legitimate interest in abating the costs of a prisoner's keep.").

---

[16]The Sixth Circuit held in *Hoevenaar* that the district court had improperly discounted the evidence presented by prison officials regarding the problematic nature of "individualized exemptions" in relation to prison safety and security.  The warden's testimony had shown that "individualized exemptions are problematic because they cause resentment among the other inmates, a copycat effect, and problems with enforcement of the regulations due to staff members' difficulties in determining who is exempted and who is not." 422 F.3d at 371.   "[I]ndividualized exemptions did not sufficiently protect the state's interest in security and safety, particularly in light of the deference accorded to the judgment of prison officials regarding prison operations."  *Id.* at 371-72.

The Sixth Circuit has never held that a prisoner has a statutory cause of action for monetary damages under RLUIPA.  RLUIPA creates a private cause of action for a prison inmate if section 3 is violated, and further provides that the complaining party, if successful, may "obtain appropriate relief against a government." 42 U.S.C. § 2000cc-2(a).  Two weeks ago, the Eleventh Circuit stated, "To put it mildly, there is a division of authority on th[e] question [of whether RLUIPA authorizes an award of monetary damages]."  *Smith v. Allen*, No. 05-16010, 2007 WL 2826759, *10 (11th Cir. Oct. 2, 2007) (collecting cases).  Assuming *arguendo* that RLUIPA authorizes a cause of action for damages, qualified immunity is undoubtedly an appropriate defense. *See Haley v. Donovan*, No. 06-55856, 2007 WL 2827478, at * 1 (9th Cir. Sept. 27, 2007); *Ahmad v. Furlong*, 435 F.3d 1196, 1203 (10th Cir. 2006).  Plaintiffs have not addressed much less demonstrated how defendants' actions violated any "clearly established" rights under RLUIPA.  A review of the law in this area reveals that defendants did not violate any clearly established rights. *See, e.g.*, *Russell v. Wilkinson*, 79 F. App'x at 177 and *Berryman*, 2007 WL 2259334, at * 3. Accordingly, I find that defendants are entitled to summary judgment on plaintiffs' RLUIPA claims for monetary damages on the alternative basis of qualified immunity.

## **Recommended Disposition**

For the foregoing reasons, I recommend that all plaintiffs' claims, with the exception of those claims specifically identified in section 4 of this report and recommendation as being exhausted, be dismissed for lack of exhaustion as required by 42 U.S.C. § 1997e(a).  I further recommend that plaintiff Ketzner's claims for declaratory and injunctive relief be dismissed as moot.

I further recommend that defendants' motion for summary judgment (docket # 26) be granted on all other claims and that judgment be entered in defendants' favor.


Dated:   October 23, 2007          /s/  Joseph G. Scoville
                                   United States Magistrate Judge

## NOTICE TO PARTIES

      Any objections to this Report and Recommendation must be filed and served within ten days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and responses to objections are governed by W.D. MICH. LCIVR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *McClanahan v. Commissioner*, 474 F.3d 830, 837 (6th Cir. 2006); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *Spencer v. Bouchard*, 449 F.3d 721, 724-25 (6th Cir. 2006); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).